UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KADEEN WALTERS on his own behalf,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF NEW YORK, MAYOR BILL DE BLASIO, POLICE COMMISSIONER DERMOT F. SHEA, CHIEF OF DEPARTMENT TERENCE A. MONAHAN, and POLICE OFFICER JOHN DOES # 1-12, in their individual and professional capacities,<br><br>Defendants. | CIVIL ACTION NO. 21-cv-7378 |

## NATURE OF THE ACTION

1. On June 4, 2020 Plaintiff Kadeen Walters, a young Black man, was on his way home, when he was unlawfully stopped, assaulted, and subjected to unlawful arrest and imprisonment by the New York City Police Department.

2. These unlawful acts took place in the height of a summer of protest in support of Black Lives Matter, after the killing of George Floyd at the hands of the Minneapolis Police Department.

3. Protests erupted around the country and the world against police brutality, and as Plaintiff proceeded home that day protests were ongoing in the vicinity.

4. Yet during this period of public outrage at the brutal everyday killing of Black people by police in the US, the NYPD adopted a strategy around the protests that only amplified

1

the violation of the civil rights of Black people that was already a well-known racist policy of the NYPD in stop and frisk—and which policy was among the very criticisms made by the protest.

5. In this context, to be a Black man on the streets of New York was especially dangerous.

6. In this period, Black men were disproportionately targeted for COVID related curfew enforcement.

7. Further, after the BLM summer of protest the NYPD's Department of Investigation released a report finding that the NYPD had engaged in systematic violations of the rights of protesters and those perceived as protesters.

8. It was in this context that on June 4, 2020 Plaintiff was making his way home, when he was chased by undercover police like quarry, including threatened by a speeding police car chasing him. He was tackled, slammed to the ground, stepped on, arrested without cause, and falsely imprisoned for nearly ten hours.

9. If there was any question in Plaintiff's mind as to why he was targeted while engaging in nothing other than making his way home accompanied by friends—the police, when they finally identified themselves, suggested he had broken curfew—any doubt was dispelled when he saw a White bystander filming the incident for whom the NYPD had no interest in enforcing the curfew.

10. Further, while Plaintiff was being transported in the paddywagon, he overheard an officer state that they should drive around looking for "more minorities" to arrest before returning to the precinct.

11. And that is exactly what the officers did.

12. By this action Plaintiff seeks a remedy for the ongoing custom and policy of racial

discrimination and harassment implemented by Defendants, including individual Defendants as the final policymakers for the actions which are alleged in this complaint.

13. Further, Defendants acted with deliberate indifference to constitutional violations of the rights of young black men such as Plaintiff after they continued a custom, policy and/or practice of targeting Black and Latino males for disproportionate arrest as determined in *Floyd v. City of New York.*

14. Defendants' actions under color of law amounted to a municipal policy in violation of 42 USC § 1983 and the rights guaranteed in 42 USC § 1981 and the equal protection clause of the Fourteenth Amendment.

15. By this action Plaintiff seeks damages arising from violations of his constitutional rights pursuant to 42 U.S.C. §1983 and for assault, battery, wrongful arrest, false imprisonment, and other torts.

## JURISDICTION AND VENUE

16. This action is brought pursuant to 42 U.S.C. 1983 and 1988, seeking redress for violations of the Fourth and Fourteenth Amendments of the United States Constitution, parallel New York State constitutional provisions, and state common law.

17. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. 1331 and over Plaintiff's state law claims pursuant to 28 U.S.C. 1367(a).

18. Venue is proper pursuant to 28 U.S.C. 1391(b) in that a substantial part of the events giving rise to Plaintiff's claims arose in the Southern District of New York.

19. From the period of March 20, 2020 through November 3, 2020 all claims were tolled by the governor of New York State's Executive Order 202.8 et seq. Thus, for a period of June 4, 2020 through November 3, 2020, or 152 days, Plaintiffs' state law claims were tolled.

20. All conditions precedent to bringing suit have been met. Plaintiff filed a Notice of Claim on July 15, 2020, thus within 90 days of the incident. He was interrogated at a 50-h hearing on February 24, 2021. More than thirty days has elapsed since he filed his Notice of Claim and the matter has not been adjusted.

21. All of the requirements for bringing state tort claims against a municipal entity pursuant to GML 50-e and 50-i have been met.

**PARTIES**

22. Plaintiff Mr. Kadeen Walters is a Black man.

23. Plaintiff is a resident of Kings County.

24. Defendant City of New York ("City") is a municipal corporation organized and existing under the laws of the State of New York and maintains its principal office in the County of New York. The NYPD is an agency of the City charged with law enforcement.

25. Defendant Bill de Blasio was at all times relevant to this Complaint the mayor of the City of New York and chief policymaking official with respect to City policy generally, including NYPD policy. He is sued in his individual and official capacities.

26. Defendant Dermot F. Shea was at all times relevant to this Complaint the New York City police commissioner, who has final policymaking authority with respect to the NYPD and responsibility for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD. He is sued in his individual and official capacities.

27. Defendant Terence A. Monahan was at all times relevant to this Complaint the Chief of Department for the NYPD. As the highest-ranking uniformed officer of the NYPD, Chief Monahan has been delegated final policymaking authority with respect to NYPD policies,

4

including, but not limited to, those related to management of protests, use of force, and arrests. He is sued in his individual and official capacities.

28. Police Officer John Does # 1-12 are the police officers whose identities are unknown to Plaintiff but known to Defendants.

## FACTUAL ALLEGATIONS

### PLAINTIFF IS TARGETED AND PURSUED WITHOUT PROBABLE CAUSE

29. The claim arose on June 4, 2020 at approximately a few minutes before 8:00 PM in front of the building located near 11 East Houston Street, New York, New York 10012.

30. Mr. Walters was riding his bicycle near the above referenced location on his way home to Brooklyn, which required a trip over one of New York City's bridges that allowed for bicycle and/or foot traffic.

31. Mr. Walters and his friends stopped at the intersection of East Houston and Broadway to briefly discuss the best route to the Williamsburg Bridge.

32. Just as Mr. Walters and his friends crossed Houston Street, heading south on Broadway to Prince Street, a dark colored civilian vehicle with heavily tinted windows halted near him and several white males in civilian clothing emerged from the vehicle and aggressively yelled for the Plaintiff and his friends not to move.

33. In fear for their lives, Mr. Walters and his friends immediately dispersed individually using various routes in efforts to get to the Williamsburg Bridge and not be caught by the aggressive white males in the vehicle.

34. Plaintiff was unaware of who the men directing him not to move were. They did not identify themselves as police and displayed no badges or other identification.

35. As Mr. Walters attempted to leave the area on his bicycle, he was chased by several

other unmarked cars. On several occasions he heard the driver in the car say "I'm going to hit you."

36. On each occasion Mr. Walters yelled that he just wanted to go home and didn't want any problems. He was terrified.

37. At some point someone in one of the car's activated the car's sirens. Only at this point did Mr. Walters become aware that one of the cars contained police.

38. After being chased for several blocks, passing other persons on bicycles and individuals on the street, Mr. Walters made it a short distance from the intersection of Chrystie and Broome Streets when he could hear police sirens appearing to come from every direction but getting closer to him. As Mr. Walters continued, the pursuing vehicle once again attempted to knock Mr. Walters from his bicycle.

### PLAINTIFF IS TACKLED AND BATTERED AFTER SURRENDERING AND SUBJECT TO WRONGFUL ARREST

39. At or near the intersection of Broome and Chrystie Streets, Plaintiff saw several New York City Police Department Patrol Cars and Police Officers in Uniforms exiting both marked and unmarked vehicles. Mr. Walters stopped his bike, got off and put his hands above his head as he walked towards the officers as the officers charged at him from every direction.

40. Despite being in full surrender and compliance posture, Mr. Walters was slammed to the ground and stomped on by several officers as soon as he was within arm's reach of the officers.

41. As Mr. Walter's has summarized it, "I couldn't see faces or badges, I could only see boots as I tried to protect my face."

42. Mr. Walters was taken into custody and made to sit on the ground to await the arrival of a transport van.

43.     Upon arrival of the van, Mr. Walters was scraped and bruised from the custodial force used against him but was relieved that he had not sustained any life altering physical injuries from being hit by the pursuing vehicle during several attempts or his having been stomped on by several police officers as he laid on the ground.

44.     At the time he and his friends were starting to head home, Mr. Walters was not aware of a curfew being in place. Nonetheless, there were many people on the street at the busy intersection of Houston and Broadway at the time Mr. Walters and his friends were planning their route home. In fact, Mr. Walters saw a White man filming his arrest and, after knowing the police claimed he was out after curfew, he asked the officer why they were not arresting the White man.

45.     While in custody Mr. Walters learned that one of his friends, who is White, was briefly stopped by another police unit, and told to "go home," and that another of his friends who completed food deliveries as "an essential worker" was detained but ultimately released without charges.

## IN TRANSPORT PLAINTIFF HEARS THE NYPD ADMIT THEIR DISCRIMINATORY ANIMUS

46.     While in the police transport van, after the transport officers had informed Mr. Walters and others in the van that they were heading in for processing and having called NYPD central command informing the command of the number of prisoners in custody and the estimated time of arrival to the processing precinct, Mr. Walters and others in the transport van overheard one of the officers tell his partner, "Let's go get some more minorities before we go in."

47.     Several of the detainees in the van objected to both the comment and the prolonged ride under cramped conditions with all parties not wearing masks, but the officers assured the detainees that it wouldn't be that long.

48.     While awaiting a call to "get more minorities," one of the prisoners in the van

began complaining of an inability to breathe and other medical issues.

49. Undeterred, the transport officers ultimately drove to the vicinity of Washington Square Park and picked up a Latina woman who was crowded into the van with Mr. Walters and the others, without masks or face coverings.

50. After the officers had loaded the number of minorities that would satisfy their personal goals, Mr. Walters and the other prisoners were transported to the precinct for processing in the packed and hot van that now contained vomit from the prisoner who had previously complained of a need for medical attention.

**PLAINTIFF IS FALSELY IMPRISONED FOR APPROXIMATELY 11 HOURS**

51. Upon arrival at the precinct, Mr. Walters and others were held until June 5, 2020, the sick prisoner was ultimately removed from the precinct and taken to the hospital, the group of detainees consisted of solely minority men and women and none of the detainees were offered masks or face coverings during their detention.

52. On June 5, 2020 Mr. Walters was issued a desk appearance ticket charging him with one count of having violated NY Penal Law 195.05, Obstructing Governmental Administration, a Class A Misdemeanor, while the Emergency Executive Order # 117, issued by Mayor Bill on June 1, 2020 which implemented the curfew, instructed New York City residents that, "This Order shall take effect immediately. This Order shall remain in effect through June 2, 2020 unless rescinded, superseded, or amended by further Order. Failure to comply with this Order shall result in orders to disburse [sic], and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor."

53. Mr. Walters and his friends were on their way home when initially approached. Neither Mr. Walters nor his friends were ever instructed to "go home," and they did in fact

"disperse" when approached. Mr. Walters repeatedly informed the officers that he was in fact on his way home, which required a trip over the Williamsburg Bridge. Under any circumstances, Mr. Walters should have never been charged with a Class A Misdemeanor for an alleged curfew violation that is unsubstantiated at a minimum.

54. The conduct of the Defendants—after having been issued explicit written instructions regarding how the curfew was to be implemented by an initial order to disperse and having disregarded those legal instructions—only exacerbated the ultimate physical assault of Mr. Walters.

55. Mr. Walters' degradation—with his fear of being exposed to the deadly COVID-19 virus while in a cramped van and precinct cell with unmasked officers and prisoners for the nearly 12 hours spent in police custody—was exponentially compounded after hearing and seeing that the improper enforcement of the curfew order was based upon race and nationality.

56. During the course of his unlawful detention Plaintiff repeatedly requested food and water and received none.

### NYPD and DOI REPORT AND AG LAWSUIT

57. In December 2020 the NYPD Department of Investigation released a report ("DOI Report") discussing in relevant part NYPD activities on June 4, 2020, and systemic violations of the civil rights of protesters and perceived protesters in lower Manhattan on that date. The report also examined enforcement of the curfew during the Floyd protests and found constitutional violations in the treatment of such.

58. On January 21, 2021 Attorney General Letitia James filed a pattern and practice lawsuit alleging the De Blasio Administration and the NYPD engaged in widespread violations of New York residents' civil rights, in particular the rights of African Americans and other people

of color. The case is titled People of the State of New York v. New York City Mayor Bill De Blasio et. al., Civil Action No. 21-cv-00322 (CM).

59. This case chronicled the history of large numbers of unlawful arrests by the NYPD in connection with demonstrations or other efforts of people to vindicate their rights, over many years leading up to the protests, which broke out in the aftermath of the killings of Breonna Taylor and George Floyd, among others.

60. One of the violations alleged in this suit refers to excessive unlawful arrests at protests or for alleged violations of the curfew imposed by Mayor De Blasio on June 1, 2020.

61. The complaint states: On June 1, Mayor de Blasio issued Emergency Executive Order 117, imposing an 11:00 p.m. curfew for New York City. The Mayor subsequently expanded the nightly curfew to begin at 8:00 p.m. on June 2 and end at 5:00 a.m. on June 8. These Curfew Orders exempted "essential workers" and directed that people in violation of the curfew be "order[ed] to disburse [sic]" before being arrested. Nevertheless, during the period when the Curfew Orders were in effect, Officers routinely disregarded these two provisions and arrested essential workers exempt from the executive order and protesters without the required prior orders to disperse. On June 1, 2022, the first night the curfew was in effect, NYPD Officers arrested at least 308 protesters in Manhattan at Times Square, the East Village, and Union Square Park; in Brooklyn at the Barclays Center and Bay Ridge; and in Queens at Astoria Park and in Flushing. (Complaint ¶ 40)

62. The complaint further alleges: The night of the first curfew, the NYPD issued an internal announcement, called a "Finest Message," instructing law enforcement personnel that they are to "issue reminders to anyone observed violating the curfew that they are not allowed in public … [and to] direct them to return to their homes or other private locations. Enforcement

will only be taken after several warnings are issued and the violator is refusing to comply. In that circumstance, a [criminal]-summons may be issued for Admin. Code 3-108, violating a Mayoral Emergency Order." On June 3, 2020, the NYPD circulated another Finest Message informing officers about the expansion of the curfew, but omitting the previously included direction that officers should issue warnings before making arrests. Instead, the message simply stated, "[i]f [Members of Service] observe a person violating the curfew, a [criminal]-summons may be issued for violating a Mayoral emergency order." This second Finest Message contradicts the Curfew Orders, which specifically require that an order to disperse be made. (Complaint ¶¶ 227-228)

63.    It appears that on June 4, 2020 the NYPD decided to make multiple arrests for alleged curfew violations because according to the Attorney General's complaint just at one June 4, 2020 demonstration in Mott Haven in the Bronx, NYPD Officers detained and arrested over 250 people as soon as the curfew took effect. Among those detained without probable cause were non-protesters serving as legal observers, medics, and other essential workers exempt from the curfew order. (Complaint ¶ 43)

64.    The arrest of Mr. Walters was consistent with the pattern of illegal arrests for alleged "curfew" violations, but these arrests in areas of busy foot traffic and no demonstrations, such as the corner of Houston and Broadway, do not present the kind of situation where police were concerned about protests.

65.    From Mr. Walters' experience, the officers who illegally targeted him and other minorities to arrest were using the fact of the "curfew" to target people of African Descent and other people of color for arrest. This fact was made plain to Mr. Walters when he heard his arresting officers say they were trying to find more minorities to arrest instead of taking him and the others already in the van, who were people of color, to the precinct.

## THE EXPERIENCE HAS CAUSED MR. WALTERS SEVERE EMOTIONAL DISTRESS

66. Mr. Walters has suffered from severe emotional distress arising from the events of June 4, 2020. Not only was Mr. Walters' arrest illegal, but also the incidents leading up to his arrest and his post-arrest and detention were designed to demean and dehumanize him and to cause severe emotional distress. Some of the facts supporting this claim are stated below.

67. When Mr. Walters was confronted by White men in an unmarked car who did not identify themselves as police officers as they were trying to grab him and his friends, he was in fear for his life and tried to flee.

68. As other unmarked cars chased him and threatened to hit him, he continued to be in fear for his life.

69. When he surrendered, he was tackled by 10 to 12 officers who stomped on him on his back. He could not see faces or badge numbers, just boots.

70. His arms were aggressively pulled and his wrists put in zip ties, which caused pain and bleeding. His leg was bruised and cut.

71. All or almost all of the officers who were involved were White and they seemed to delight in targeting people of color.

72. The persons these officers targeted after Mr. Walters were people of color. One was a protester from Washington Square Park, and two were essential workers who were outside their place of employment having a cigarette after work when they were arrested.

73. One of the people who was already in the van when Mr. Walters was arrested, told the officers he could not breathe as he suffered from asthma. The officers ignored him. He was eventually taken to the hospital in the early morning hours after his health deteriorated. It was

very upsetting to Mr. Walters to experience the indifference of the police to the health of a fellow black arrestee.

74. Indeed, Mr. Walters got no medical attention for his leg injuries.

75. While in the lock up, one of the other prisoners got sick and vomited in the cell. The officers refused to assist in cleaning it up or attending to the ill prisoner.

76. Mr. Walters noted that all the people in Central Booking that night were dark skinned and the officers were White.

77. There were also no COVID precautions taken. No one was masked.

78. Mr. Walters was released by 7am or 8am in the morning having been in jail for about 12 hours with no food or medical attention. As his bicycle had been confiscated, he had no transportation and was thus required to walk home on his injured leg.

79. It took the intervention of his attorneys to locate his bicycle and get it returned after several weeks.

80. All of these experiences caused him to feel degraded, demeaned and less than human. He now finds himself afraid whenever he sees a police officer. He has flashbacks to these events when he sees police now.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### 42 U.S.C. § 1983 for Violations of the Fourth and Fourteenth Amendments - Excessive Force against All Defendants

81. Plaintiff incorporates by reference the factual allegations set forth herein.

82. The Fourth and Fourteenth Amendments protect individuals against the unreasonable use of police force, both before and during seizure.

83. Defendants have implemented, enforced, encouraged, sanctioned and/or ratified policies, practices and/or customs of using various forms of excessive force when policing the Protests in violation of the Fourth and Fourteenth Amendments, including through (a) the failure to adequately and properly screen, train, and supervise NYPD Officers; (b) the failure to properly and adequately monitor and discipline NYPD Officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify the NYPD's practice of using excessive force before and at the Protests.

84. The aforementioned policies, practices, and customs include, but are not limited to, the following unconstitutional practices:

   a. tackling, battering and placing Plaintiff prone while standing on his back, compressing his lungs;

   b. assaulting Plaintiff by placing him in fear for his life by pursuing him in a car within inches of his body as he travelled by bike, repeatedly threatening to run him over.

   c. using unreasonably tight plastic zip-ties to effect his arrests without adequate monitoring of or response to complaints by detainees, resulting in the loss of circulation and pain to Plaintiff.

85. As a result of these policies, practices and customs, Plaintiff was deprived of his liberty, property, and constitutional rights and experienced bodily injury, pain and suffering.

86. Defendants have acted with deliberate indifference to the Fourth and Fourteenth Amendment rights of Plaintiff. Defendants' acts and omissions have directly and proximately violated the Fourth and Fourteenth Amendment Rights of Plaintiff. By acting under the color of state law to deprive Plaintiff of his rights under the Fourth Amendment, Defendants violated 42

U.S.C. § 1983.

87. As a direct and proximate result of Defendants' illegal conduct, Plaintiff suffered significant physical pain and emotional damages as described herein.

## SECOND CLAIM

### 42 U.S.C. § 1983 (Equal Protection)

88. Plaintiff incorporates by reference the allegations set forth in the factual allegations.

89. By the actions described above, among others, Defendants in their official and individual capacities, have denied Plaintiff on the basis of his race, national origin, ethnicity and/or color, the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens of the United States, in violation of 42 USC §1981 and in violation of the Equal Protection clause of the Fourteenth Amendment.

90. At all times Defendants acted under color of law as a final policy maker to deprive Plaintiff of his right to be free from unlawful search and seizure because of his race, undertaking such acts as a deliberate municipal policy to subject Plaintiff to deprivation of his rights.

91. At all times relevant as alleged herein, individual Defendants participated in such actions personally.

92. As a direct and proximate result of Defendants' illegal conduct, Plaintiff suffered significant physical pain and emotional damages as described herein.

## THIRD CLAIM

### 42 U.S.C. § 1983 for Violations of
### the Fourth Amendment – Unlawful Seizure Against All Defendants

93. Plaintiff incorporates by reference the allegations set forth in the factual

allegations.

94. The Fourth Amendment protects individuals from unlawful detention and arrest.

95. Defendants have implemented, enforced, encouraged sanctioned, and/or ratified policies, practices, and/or customs of effectuating unlawful detentions and arrests against people of color without probable cause in violation of the Fourth Amendment, including through failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with violations of the COVID curfew;

a. arresting people without ensuring that constitutionally sufficient notice and opportunity to disperse were given;

b. arresting Plaintiff without probable cause; and

96. As a result of these policies, practices and customs, Plaintiff was deprived of his liberty, property, and constitutional rights and experienced bodily injury, pain and suffering.

97. Defendants have acted with deliberate indifference to the Fourth Amendment rights of Plaintiff. Defendant's acts and omissions have directly and proximately violated the Fourth Amendment Rights of Plaintiff. By acting under the color of state law to deprive Plaintiffs of their rights under the Fourth Amendment, Defendants violated 42 U.S.C. § 1983, which prohibits under color of state law the deprivation of rights secured by the United States Constitution.

98. As a direct and proximate result of Defendants' illegal conduct Plaintiff suffered significant physical pain and emotional damages as described herein.

## FOURTH CLAIM

**New York State Constitution – Article I, § 12 (Excessive Force) Against All Defendants**

99. Plaintiff incorporates by reference the allegations set forth in the factual allegations.

100. NYPD Officer Defendants John Does 1-12 used unjustified and excessive force against Plaintiff in violation of Section 12 of Article 1 of the New York State Constitution.

101. The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and/or sanctioned by Defendant.

102. As a result of these abuses, Plaintiff was deprived of their liberty, property, and constitutional rights and also experienced bodily injury, pain, and suffering.

103. In using excessive force against Plaintiff, NYPD Officer Defendants John Does 1-12 were acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officer Defendants John Does 1-12, is responsible for the wrongdoing of NYPD Officer Defendants John Does 1-12 under the doctrine of *respondeat superior*.

104. As a direct and proximate result of Defendants' illegal conduct Plaintiff suffered significant physical pain and emotional damages as described herein.

## FIFTH CLAIM

**New York State Constitution – Article I, § 12 (Unlawful Seizure) against All Defendants**

105. Plaintiff incorporates by reference the allegations set forth in the factual allegations.

106. NYPD Officer Defendants John Does 1-12 seized Plaintiff without the reasonable articulable suspicion of criminality required by Section 12 of Article 1 of the New York State Constitution.

107. The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and/or sanctioned by Defendants.

108. As a result of these abuses, Plaintiff was deprived of his liberty, property, and

constitutional rights.

109. In unlawfully seizing Plaintiff, NYPD Officer Defendants John Does 1-12 were acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officer Defendants John Does 1-12, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

110. The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants.

111. In attacking Plaintiff, NYPD Officer Defendants John Does 1-12 were acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officer Defendants John Does 1-12, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

112. As a direct and proximate result of Defendants' illegal conduct Plaintiff suffered significant physical pain and emotional damages as described herein.

### SIXTH CLAIM
**Assault under the Laws of the State of New York against All Defendants**

113. Plaintiff incorporates by reference the allegations set forth in the factual allegations.

114. As a result of the foregoing, Plaintiff was placed in apprehension of imminent harmful and offensive bodily contact without privilege or consent.

115. As a result of NYPD Officer Defendants John Does 1-12's tortious conduct, Plaintiff suffered physical injury and mental anguish.

116. NYPD Officer Defendants John Does 1-12 assaulted Plaintiff while acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officer

Defendants John Does 1-12, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

117. As a direct and proximate result of Defendants' illegal conduct Plaintiff suffered significant physical pain and emotional damages as described herein.

### SEVENTH CLAIM

**Battery under the Laws of the State of New York against All Defendants.**

118. Plaintiff incorporates by reference the allegations set forth in the factual allegations.

119. NYPD Officers made offensive contact with Plaintiff without privilege or consent.

120. As a result of NYPD Officer Defendants John Does 1-12's tortious contact, Plaintiff suffered physical injury and mental anguish.

121. NYPD Officer Defendants John Does 1-12 battered Plaintiff while acting within the scope of their employment. Defendant City of New York, as the employer of NYPD Officer Defendants John Does 1-12, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

122. As a direct and proximate result of Defendants' illegal conduct Plaintiff suffered significant physical paid and emotional damages as described herein.

### EIGHTH CLAIM

**False Arrest and Imprisonment under the Laws of the State of New York against All Defendants**

123. Plaintiff incorporates by reference the allegations set forth in the factual allegations.

124. NYPD Officers unlawfully seized Plaintiff, wrongfully detaining and confining him without privilege or consent.

125. NYPD Officers falsely imprisoned Plaintiff. Defendants are responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*. As a direct and proximate result of Defendants' illegal conduct Plaintiff suffered significant physical pain and emotional damages as described herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests the following relief:

A. Compensatory damages for emotional distress and suffering;

B. Compensatory damages for physical distress and suffering;

C. Attorney's fees and costs;

D. Such relief as is authorized by federal and city law; and

E. Awarding Plaintiffs such other relief as the court deems just and proper.

## JURY TRIAL

Plaintiff demands a jury trial for all causes of action and claims for which he has a right to a jury trial.

Dated: New York, New York
September 2, 2021

Respectfully Submitted,

*/s/*

Jeanne E. Mirer and Ria Julien
Mirer Mazzocchi & Julien, PLLC
By: Jeanne E. Mirer and Ria Julien
1 Whitehall St., 16th floor
New York, NY 10004
(212) 231-2235
*Attorneys for Plaintiff*